**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

LISA WELCH,

        Plaintiff,

  v.

NANCY A. BERRYHILL,
Acting Commissioner,
Social Security Administration,

        Defendant.

**CIVIL ACTION**

**NO. 4:17-cv-12298-TSH**

<u>**REPORT AND RECOMMENDATION**</u>

**February 1, 2019**

Before the Court are Plaintiff's motion for an order reversing the decision of the Commissioner and Defendant's motion for order affirming the decision of the Commissioner. Dkt. nos. 20, 21.

I.      Background

      A.  Facts

On April 11, 2016, at her most recent hearing for social security benefits, Plaintiff Lisa M. Welch was a 33-year-old mother of three. Dkt. no. 17-11, p. 54. At the time, her children were twelve, ten, and seven. <u>Id.</u> She had not worked since March 2010. <u>Id.</u> at 55. She received disability benefits from the Commonwealth of Massachusetts as well as welfare and food stamps. <u>Id.</u>

1

Welch expressed that fatigue and pain in her joints, due to fibromyalgia and rheumatoid arthritis, were factors that most contributed to her inability to work.  Id. at 56.  She was unable to distinguish symptoms resulting from fibromyalgia versus symptoms resulting from rheumatoid arthritis.  Id.  She reported pain, swelling, inability to hold things, and muscle spasms.  Id. at 57.  Her symptoms had previously been treated with Methotrexate, which she stopped taking about one year prior to the hearing, and reported taking Motrin since, even though the Motrin resulted in ulcers.  Id. at 56.  Welch testified that the Methotrexate caused nausea and fatigue, making her unable to do anything for a few days following the weekly shot.  Id. at 68.

Welch lost one eye at a young age due to a retinoblastoma.  Dkt. no. 17-7, p. 37.  She experiences difficulty with depth perception, but otherwise is not limited by her impaired vision.  Dkt. no 17-11, p. 58.

Welch was the victim of assault and testified that she continues to have social anxiety as a result.  Id. at 60.  Her social anxiety generally prevents her from being around people, which more specifically means that she does not socialize with friends and runs errands only at times that she knows that the destination will be less busy.  Id. at 61.  Welch testified that running errands causes her significant stress and that she often will spend the next day resting.  Id. at 67.  At the time of the hearing, Welch took Klonopin for her anxiety.  Id. at 61.  Welch stated that her anxiety could exacerbate her rheumatoid arthritis.  Id. at 65.  At the time of the hearing she was not in counseling or therapy.  Id. at 61.

In addition to generalized joint pain, anxiety and impaired vision, Welch complained of ankle pain and instability, eczema, ulcers from taking ibuprofen, and concentration problems.  Welch explained that she had "good days and bad days," and that she had days when she could

not get out of bed "a couple times a week." Id. at 65-66. Welch explained that her children help cook, chop, and open jars, which she is not able to do. Id.

Welch has not been employed since January 2010, when she was employed part-time as a waitress. Dkt. no. 17-7, p. 44. Her longest job was at Dunkin' Donuts, from June 2005 through January 2007, but she left due to her pregnancy. Id. She reported "really bad anxiety" and difficulty being around people. Id. Welch reported looking for work. Id.

Welch has an extensive medical history, which has involved numerous treating, evaluating, and reviewing medical professionals. The Court considers the roles and opinions of many of those medical professionals below. Throughout the meeting notes, it is often reported that Welch presented with a normal appearance, displayed nervous or anxious behavior, and reported pain.

### 1. Dr. Ramey

Dr. Ramey treated Welch for osteoarthritis/rheumatoid arthritis and fibromyalgia from March 26, 2010 through the present.[1] Dkt. no. 17-7, p. 2. In a letter addressed to Dr. Delrosario dated April 1, 2010, Dr. Ramey wrote that Welch had CMC arthritis, chronic ulnar styloid involvement on the right side, and enesopathy, "all consistent with a mild presentation of seronegative RA." Id. at 23. Dr. Ramey treated Welch by prescribing Plaquenil, Prednisone, and Ansaid. Id. Dr. Ramey met with Welch in 2011 on January 31; April 8; April 15; April 21; April 29; May 13; June 24; September 23; and December 16. Dkt. no. 17-9. At each of these meetings, Dr. Ramey followed up on Welch's treatment and refined her prescriptions. Id. At a follow-up visit on March 22, 2012, Dr. Ramey prescribed weekly Methotrexate injections. Dkt. no. 17-18, pp. 71-72. Welch initially reported relief from symptoms as a result of the

---

[1] Elsewhere, the record states that Welch's first visit with Dr. Ramey was in 2009. See Dkt. no. 17-6, p. 11.

Methotrexate.  Id.  Except for a few months, Welch remained on Methotrexate through October 27, 2014.  Dkt. no. 17-19, p. 94.   At her October 27, 2014 visit, Welch reported nausea and vomiting from Clindamycin and tooth abscess.  Id.  Welch did not complain to Dr. Ramey of any side effects from the Methotrexate until she decided to stop taking the medication.  Id.  At her next office visit on April 16, 2015, Welch reported having ceased all medication due to adverse reactions such as vomiting as a result of taking Clindamycin with Methotrexate.  Id.  In his notes from that office visit, Dr. Ramey reported that Welch appeared to have "recovered some function".  Id.

On August 24, 2015, Dr. Ramey completed a fibromyalgia residual functional capacity ("RFC") questionnaire.  Dkt. 17-18, p. 117.  He based his diagnosis of fibromyalgia on a trigger point exam and Welch's medical impairments of polymyalgia, polyarthralgia, and periarthritis.  Id.  He opined that emotional factors contributed to the severity of Welch's symptoms and that she experienced fibromyalgia pain in her knees/ankles/feet on both sides.  Id. at 118.  Dr. Ramey stated that Welch's symptoms would frequently interfere with the attention and concentration needed for Welch to perform even simple work tasks, but also found that she could tolerate a moderate amount of work stress.  Id. at 118.  Dr. Ramey reported that Welch could sit for 15 minutes before needing to stand, stand for five minutes before needing to sit, and needed to walk every 15 minutes for three minutes.  Id.  He wrote that he expected that Welch would need to take 10 unscheduled breaks of 10 minutes each during an eight-hour workday.  Id. at 120. Dr. Ramey reported that Welch could not lift and carry more than 10 pounds, that she could rarely lift and carry 10 pounds, and that she could occasionally lift and carry less than 10 pounds in a competitive work situation.  Id.  He wrote that Welch could rarely twist, stoop, or crouch, and that she could never climb ladders or stairs.  Id.  Dr. Ramey opined that Welch would likely be

absent from work as a result of her impairments or treatment more than four days a month.  Id. at 121.

### 2.  Dr. Miller

On March 18, 2010, Dr. Juliane Miller evaluated Welch's mental health.  Id. at 8-9.   In her notes, Dr. Miller recounted Welch's history of trauma and anxiety, including her parent's divorce when she was young, social phobia that led Welch to drop out of school while in the 11th grade, panic attacks, and an unsupportive and abusive husband.[2]  Id. at 8.  Dr. Miller diagnosed Welch with anxiety and prescribed Klonopin.  Id.

### 3.  Dr. Jolda

On October 12, 2010, Dr. Ronald S. Jolda examined Welch to provide an opinion with regard to her application for social security disability benefits.  Id. at 26.  Dr. Jolda noted that Welch complained of constant pain, difficulty sleeping, arthritis, and anxiety.  Id.  Welch reported that the joints and tendons in her hands caused her pain, and that they became swollen and red.  Id.  Dr. Jolda did not observe swelling or any other signs of arthritis in Welch's hands, and reported that Welch had full range of motion in all her joints, although she found the test painful.  Id. at 29.  Similarly, Welch complained of pain in her knees, but Dr. Jolda did not find any signs of patella femoral syndrome.  Id.  Dr. Jolda's impressions were that her symptoms were more indicative of a chronic pain-type syndrome than of arthritis, but that she may have positive blood markers for rheumatoid arthritis.  Id. at 30.  He wrote that Welch's mental health

---

[2] Other records note a history of physical and emotional abuse by her husband, the father of her children.  See dkt. no. 17-7, p. 11.

issues appeared to play a significant role in her problems.  Id.  Dr. Jolda opined that Welch was

capable of light work and that her RFC might improve if her pain were better managed.  Id.

### 4.  Dr. Kent

On October 27, 2010, Dr. Kent performed a psychodiagnostic interview for purposes of

social security disability benefits.  Dkt. no. 17-7, pp. 43-46.  Dr. Kent's impression was that

Welch was dealing with a number of stressors, including "a) involvement in a relationship she

does not want to be in, b) housing that she is unhappy in, and c) the apparent inability to change

her current situation due to finances."  Id. at 45-46.  He reported that there were some depressive

elements, but that there was no indication of a primary depressive disorder.  Id. at 46.  Dr. Kent

found that Welch had difficulty dealing with the public and with significant changes to her

routine.  Id.  He provided the following diagnosis:

| | |
|---|---|
| Axis I: | Anxiety Disorder NOS |
| | r/o Generalized Anxiety Disorder |
| | r/o Panic Disorder w/o Agoraphobia |
| | r/o Adjustment disorder with mixed anxiety and depressed mood |
| Axis II: | Deferred |
| Axis III: | Rheumatoid Arthritis (by history) |
| Axis IV: | Financial, housing, primary support group |
| Axis V: | GAF = 55-60[3] |

Id.

### 5.  Ms. Haskell

Victoria Haskell, LMHC of Community Healthlink, met with Welch on February 13,

2012 for a psychiatric intake examination.  Dkt. no. 17-16, p. 60.  Welch recounted the same

---

[3] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning."  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. text revision 2000).  A GAF score in the 51-60 range indicates "moderate" (and not serious) symptoms or difficulty in social and occupational functioning.  American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, (4th Ed. 1994).

history and difficulties as she did in her meeting with Dr. Kent on October 27, 2010.  Ms.
Haskell diagnosed Welch with generalized anxiety disorder and assigned her a GAF score of 55.
Id.  Welch attended counseling with Ms. Haskell on a weekly or bi-weekly basis through May 7,
2012.  Dkt. no. 17-17, p. 40-58.

### 6.  Dr. Weeratne

On October 13, 2010, Dr. Weeratne evaluated Welch for purposes of her social security
benefits applications.  Dkt. 17-7, p. 35.  Dr. Weeratne did not examine Welch, instead basing the
evaluation on prior medical records from Dr. Jolda and Dr. Ramey.  Id. at 36.  Dr. Weeratne
found that Welch's primary diagnosis was rheumatoid arthritis and opined that she had the
following restrictions: Welch could occasionally lift 20 pounds and frequently lift up to ten
pounds.  Id.  Welch could stand and/or walk for six hours of an eight-hour workday.  Id.  Welch
could sit for six hours of an eight-hour workday.  Id.  Welch could frequently climb stairs;
occasionally climb ladders; frequently balance, stoop, kneel or crouch; and occasionally crawl.
Id. at 37.  Welch was limited in her ability to handle, but unlimited in her ability to reach in all
directions and use her fingers to finely manipulate.  Id. at 38.  Dr. Weeratne found that Welch
had limited depth perception and field of vision, but otherwise had unlimited vision.  Id.  Dr.
Weeratne found no environmental limitations other than the presence of hazards.  Id.

### 7.  Dr. Flaminiano

Dr. Lourdes Flaminiano was listed as Welch's primary care physician throughout this
time.  In office visits as early as December 7, 2011, Welch complained of pain due to rheumatoid
arthritis.  Dkt. no. 17-16, p. 68.  Dr. Flaminiano referred Welch to Dr. Ramey for treatment of the
rheumatoid arthritis, however Dr. Flaminiano did not observe any tenderness, redness, or

swelling in Welch's legs or joints upon examination.  Id.  Dr. Flaminiano's notes also indicate that Welch reported anxiety to Dr. Flaminiano at numerous appointments.  Id. at 60-68.

Between 2011 and 2015, Dr. Flaminiano consistently diagnosed Welch with rheumatoid arthritis and anxiety.  Dkt. 17-21, pp. 1-26.  Dr. Flaminiano prescribed Klonopin for Welch's anxiety, beginning on November 21, 2012.  Id. at 21.  More recently, Dr. Flaminiano diagnosed Welch with gastroesophageal reflux disease ("GERD").  Id. at 3.

### 8.  Dr. Ketsler

On February 14, 2014, Dr. Inna Ketsler conducted a physical examination of Welch as part of Welch's application for disability benefits.  Dkt. no. 17-20, pp. 49-52.  After discussion and evaluation of Welch's medical complaints, Dr. Ketsler determined that Welch's limitations appeared to arise more from her anxiety than her rheumatoid arthritis.  Id. at 52.

On June 19, 2016, Dr. Ketsler performed a second evaluation of Welch for purposes of a Massachusetts disability benefits application.  Dkt. no. 17-20, pp. 14-17.  Dr. Ketsler described Welch as a "33-year-old who has a history of rheumatoid arthritis" but she "did not find any swelling in any of the joints" despite Welch's report of stiffness.  Id. at 16.  Dr. Ketsler wrote that Welch's impairment comes from fatigue and stiffness in the joints, in addition to lack of education or job training.  Id.

### 9.  Dr. Manning

On February 19, 2014, Dr. Manning evaluated Welch for the purpose of her Massachusetts disability claim.  Dkt. no. 17-20, p. 63.  He found that she could occasionally carry 20 pounds, frequently carry 10 pounds, stand and/or walk six hours out of an eight-hour workday, and sit for all eight hours of an eight-hour workday.  Id.  Dr. Manning found that

Welch was limited in her upper extremities when it came to pushing and/or pulling.  Id.  Dr. Manning determined that Welch could frequently balance, climb stairs, stoop, crouch, kneel, and crawl, but could never climb ladders.  Id.  Dr. Manning found that Welch's only environmental limitation was that her workplace had to be free of hazards.  Id. at 64.

### 10. Dr. Cirillo

On September 3, 2015, Dr. Michael Cirillo conducted a psychiatric examination of Welch in relation to her Massachusetts disability claim.  Dkt. no. 17-20, p. 18-21.  In his report, Dr. Cirillo diagnosed Welch with "clinically significant PTSD" and a severe social phobia.  Id. at 20.  Dr. Cirillo estimated that Welch's intelligence was above-average, that she was articulate, and verbally quick.  Id.  Dr. Cirillo determined that Welch "evidenced moderate limitations in her ability to learn tasks of varying complexity" and that she was exceedingly anxious.  Id.  He suggested that Welch had limited capacity to interact with others effectively and would have difficulty adapting to a work environment.  Id.  Overall, Dr. Cirillo diagnosed Welch with moderate limitations in her ability to work due to severe PTSD and social anxiety.  Id.

### 11. Dr. Whitehorn

On November 16, 2010, Dr. Whitehorn performed a mental RFC assessment of Welch for purposes of her application for Massachusetts disability benefits.  Dkt. 17-7, p. 64.  Dr. Whitehorn determined that Welch suffered from ananxiety disorder.  Id. at 55.  He found that she was moderately restricted in her activities of daily living; had moderate difficulty maintaining social functioning; had moderate difficulty maintaining concentration, persistence, or pace; and had no episodes of decompensation of extended duration.  Id. at p. 60.  Dr. Whitehorn further noted moderate limitations in Welch's ability to do each of the following: maintain attention and

concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number of rest periods of unreasonable length; get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and travel in unfamiliar places or use public transportation.  Id. at pp. 64-65.

   B.  Procedural Posture

Welch first sought Title II and Title XVI benefits on April 16, 2010, claiming disability as of March 29, 2010.  Dkt. no. 17-5, pp. 4-17.  Both claims were denied on December 16, 2010.  Dkt. no. 17-4, pp. 2-7.  Welch sought reconsideration on February 9, 2011, which was denied on May 5, 2011.  Id. at 8.  On May 12, 2011, Welch requested a hearing before an administrative law judge ("ALJ").  Id. at 18-19.  A hearing was held on April 30, 2012 in Worcester, Massachusetts.  Id. at 41-46.  A supplemental hearing was held on May 23, 2012.  Id. at 78-95.  ALJ Leonard Cooperman issued a determination on December 24, 2012, finding that Welch had the RFC to perform sedentary work with only occasional exposure to the public, without any climbing, kneeling, crouching, or stooping, if provided with a sit/stand option.  Dkt. no. 17-3, p. 9.  Finding that such jobs existed in significant numbers in the national economy, ALJ Cooperman determined that Welch was not disabled.  Id. at 10-11.  Welch's application to the Appeals Council for review of ALJ Cooperman's May 24, 2012 decision was denied on August 5, 2013.  Dkt. no. 17-2, pp. 2-6.

Welch filed an appeal of the decision of the Social Security Administration (the "SSA") in district court on October 1, 2013.  Dkt. no. 17-12, p. 4.  On August 7, 2014, Acting Commissioner of Social Security (the "Commissioner") Carolyn W. Colvin filed an unopposed

motion for entry of judgment with reversal and remand.  Id. at 10-13.  Specifically, the Commissioner sought *de novo* review and a hearing by the ALJ to "reevaluate Plaintiff's right eye impairment at Step 2; reevaluate the State agency medical opinion of Dr. Weeratne (located at dkt. no. 17-7, p. 35), particularly the visual and manipulative limitations expressed therein; give further consideration to Plaintiff's residual functional capacity, and specify the length and frequency of Plaintiff's need to alternate between sitting and standing; and, if warranted, obtain supplementary VE testimony."  Id. at 12.  On August 12, 2014, Judge Hillman adopted the motion and remanded the case to the SSA for further proceedings in accordance with the Commissioner's motion.  Id. at 8-9.  On November 4, 2014, the Appeals Council vacated ALJ Cooperman's May 24, 2012 decision and remanded.  Id. at 14.[4]

A hearing was held on September 24, 2015 before ALJ Cooperman.  Dkt. no. 17-13, pp. 24-39.  At the hearing, ALJ Cooperman offered to grant benefits as of January 1, 2014, or recuse himself and schedule a new hearing before another ALJ.  Dkt. no. 17-11, pp. 112-13.  A new hearing was set for April 11, 2016.  Dkt. no. 17-13, pp. 48-62.  ALJ Addison Masengill presided over the April 11, 2016 hearing.  Id.  On July 29, 2016, ALJ Masengill issued a decision finding that Welch suffered from severe impairments of osteoarthritis, rheumatoid arthritis, fibromyalgia, monocular vision, and anxiety.  Dkt. no. 17-11, p. 16.  ALJ Masengill determined that Welch had an RFC to perform light work that was limited to:

> unskilled tasks, involving no direct overhead reaching or lifting, no exposure to damp environments, and work should not require binocular vision.  There should be no more than incidental public contact, no more than occasional coworker contact, no more than incidental exposure to extremes of cold or vibration.  Work should not require the operation of foot/leg controls and entail more than frequent grasping, pinching, or twisting with the hands.

---

[4] The language found in Judge Hillman's remand order was adopted from the Commissioner's unopposed motion for remand.  Dkt. no. 17-12, pp. 8-9, 12.  The Appeals Council used the same language verbatim in its remand order remanding to the ALJ.  Id. at 14.  For purposes of this order, the Court will refer to the remand language as the "Remand Order".

Id. at 30.  Finding that jobs existed in significant numbers in the national economy that Welch could perform, ALJ Masengill determined that Welch was not disabled.  Id. at 27-28.

On August 26, 2016, Welch submitted written exceptions to ALJ Masengill's decision. Id. at 2.  Upon consideration of Welch's exceptions, and a finding that the ALJ decision complied with the Remand Order, as well as applicable laws, regulations and Social Security Rulings, the Appeals Council did not assume jurisdiction and ALJ Masengill's July 29, 2016 decision was adopted as the final decision (the "Decision") of the SSA.  Id. at 3.

Welch filed a complaint with this Court on November 21, 2017, seeking review.  Dkt. no. 1.  On March 2, 2018, Acting Commissioner Berryhill answered the complaint and submitted the record.  Dkt. no. 16, 17.  On April 13, 2018, Welch filed a motion for an order reversing the Decision.  Dkt. no. 20.  On May 1, 2018, the Commissioner filed a motion for an order affirming.  Dkt. no. 21.  On May 15, 2018, Welch replied to the Commissioner's motion for order affirming the Decision.  Dkt. no. 23.  The parties' motions were referred to the undersigned by Judge Hillman on October 9, 2018 for a Report and Recommendation.  Dkt. no. 24.

II.     Standard of Review

The District Court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).  However, the Court may not disturb the Commissioner's findings where they are supported by substantial evidence and the Commissioner has applied the correct legal standard.  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  Although the record might support multiple conclusions, the Court

must uphold the Commissioner's findings when they are supported by substantial evidence. Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 770 (1st Cir. 1991). The quantum of proof necessary to sustain the Commissioner's decision is less than a preponderance of the evidence. Bath Iron Works Corp. v. U.S. Dep't of Labor, 336 F.3d 51, 57 (1st Cir. 2003). Therefore, a finding that a claimant's allegations are supported by substantial evidence does not mean that the Commissioner's decision is unsupported by substantial evidence.

It is the plaintiff's burden to prove that she is disabled within the meaning of the Social Security Act. Bowen v. Yuckert, 482 U.S. 137, 146 (1987). The plaintiff bears the burden of production and persuasion at Steps One through Four of the sequential evaluation process. Id. at 146 n.5; Vazquez v. Sec'y of Health & Human Servs., 683 F.2d 1, 2 (1st Cir. 1982). This includes the burden of establishing her RFC. 20 C.F.R. § 404.1512(c).

III.    Analysis

Welch challenges the Commissioner's adoption of ALJ Masengill's Decision denying Welch's applications for Title II and Title XVI benefits. Dkt. no. 20. Welch argues that the Decision disregards the Remand Order; that the ALJ erred by failing to afford proper weight to the opinion of Welch's treating physician, Dr. Ramey; and that at Step Five of the analysis, the ALJ relied upon a job that does not meet Welch's acknowledged limitations. Id. The Commissioner asks the Court to affirm. Dkt. no. 21. The Court reviews each argument in turn.

A.  Compliance with the Remand Order

Welch moves for a remand, arguing that the Decision failed to fulfill the requirements set out in the Remand Order. Dkt. no. 20. In the Remand Order, Judge Hillman directed the ALJ to:

- Give further consideration to claimant's right eye impairment at Step 2.

13

- Reevaluate the State agency medical opinion of Dr. Weeratne, particularly the visual and manipulative limitations expressed therein.

- Give further consideration to the claimant's maximum residual functional capacity, considering all of the evidence and opinions in the record, and specify the length and frequency of the claimant's need to alternate between sitting and standing (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16, 96-8p and 96-9p).

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. The hypothetical questions should reflect the specific capacity/limitations established by the records as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-04p).

Dkt. no. 17-12, p. 17.  These criteria were in response to ALJ Cooperman's 2012 finding that Ms. Welch had the RFC to perform sedentary work, except "she would require a sit/stand option, could have only occasional exposure to the public, and could not climb, kneel, crouch, or stoop." Dkt. no. 17-3, p. 9.  In accordance with the Remand Order, the ALJ was to make a *de novo* determination.  Id. at 14.

Welch argues that ALJ Masengill's decision after remand did not "specify the length and frequency of the claimant's need to alternate between sitting and standing," and therefore did not meet the letter of the Remand Order.  Dkt. no. 20.  The undersigned disagrees.

Determining the "length and frequency" of intervals of sitting and standing involves assigning a number or value to each activity, based on the record.  The determination could be anywhere within a range during an eight-hour work day; for example, from one minute of

14

standing for every 59 minutes of sitting to 59 minutes of standing to one minute of sitting.  Here,

on remand, ALJ Masengill engaged in that very determination.  The ALJ found that the values

were "zero," i.e. that the record did not support a sit/stand protocol.  Contrary to Welch's

argument, this determination simply does not reflect a failure to follow the mandate.  ALJ

Masengill addressed the issue as follows:

> The undersigned finds the records do not support greater physical limitations. The
> undersigned does not include limitations on postural activity because the
> consistency is not there to support it.  The only observation of difficulties with the
> knees was the claimant's inability to complete a squat for Dr. Jolda.  All other
> examinations of her knees are unremarkable for consistent tenderness or
> decreased functioning.  Dr. Ramey certainly does not document any acute
> findings.

Dkt. no. 17-11, p. 33.  Accordingly, I find that ALJ Masengill fulfilled the mandate and, if not

directly, indirectly addressed the length and frequency of a sit/stand protocol.

Welch next appears to argue that by determining essentially that the length and frequency

values were zero – and not some other number – ALJ Masengill has violated the law of the case

doctrine and the rule of mandate.  Welch argues that the law of the case doctrine and the rule of

mandate both apply, and therefore that ALJ Masengill's determination that Welch was able to

work without a sit/stand option is an abuse of discretion.

"The law of the case doctrine generally prohibits a court from considering an issue that

has already been decided by that same court or a higher court in the same case."  Stacy v. Colvin,

825 F.3d 563, 567 (9th Cir. 2016) (citing Hall v. City of Los Angeles, 697 F.3d 1059, 1067 (9th

Cir. 2012)).  Welch also cites to Drummond v. Commissioner of Social Sec., 126 F.3d 837, 842

(6th Cir.1997) ("Absent evidence of an improvement in a claimant's condition, a subsequent

ALJ is bound by the findings of a previous ALJ.  We reject the Commissioner's contention that

the Social Security Administration has unfettered discretion to reexamine issues previously

determined absent new and additional evidence.  To allow the Commissioner such freedom would contravene the reasoning behind 42 U.S.C. § 405(h) which requires finality in the decisions of social security claimants.  Just as a social security claimant is barred from relitigating an issue that has been previously determined, so is the Commissioner.").

The rule of mandate is similar to, but broader that the law of the case doctrine.  Stacy, 825 F.3d at 567-68.  It provides that a court that has received a mandate may not examine the mandate, except to execute it.  Id. at 568.  It "precludes a lower court from contravening the rulings of a higher court made at an earlier stage of the same controversy." Conley v. United States, 323 F.3d 7, 12, (1st Cir. 2003).  On remand, a lower court may "decide anything not foreclosed by the mandate."  Stacy, 825 F.3d at 568 (quoting Hall, 697 F.3d at 1067).  Moreover, "the law of the case and the rule of mandates are not straightjackets.  These doctrines are directed more toward legal conclusions than toward factual findings.  Even in the context of legal conclusions, for example, law of the case 'does not limit a tribunal's power' but guides its exercise of discretion." Bowring v. SSA Comm'r, No. 1:09-cv-00573-JAW, 2011 WL 5190789 (D. Me. Oct. 28, 2011) (citing Harlow v. Children's Hosp., 432 F.3d 50, 55 (1st Cir. 2005)) (quoting Arizona v. California, 460 U.S. 605, 618 (1983)).

Invoking Stacy, Welch argues that, absent new evidence or exceptional circumstances, an ALJ does not have the discretion to review determinations by a prior ALJ that were not the subject of the Remand Order.  In particular, Welch contends that by determining that Welch did not need a sit/stand option where ALJ Cooperman had previously determined that she did require a sit/stand option, after the mandate directing the ALJ to put a value on the length and frequency of this option, ALJ Masengill exceeded the scope of his remand authority.  Dkt. no. 20.

16

As noted above, the undersigned finds that the Remand Order expressly contemplated *de novo* review of the sit/stand protocol, and that ALJ Masengill followed the letter of the Remand Order in determining from the record that no such protocol was required; in other words, ALJ Masengill put a value on length and frequency, and that value is zero.  However, even putting this aside, the undersigned separately finds that ALJ Masengill's discretion on remand was necessarily broadened by the Remand Order's express recognition that review would involve an "expanded record."  See Dkt. no. 17-12, p. 17 ("If warrant by the expanded record …").  In fact, the Remand Order accurately anticipated what would occur: approximately 500 pages of medical documentation was added to the record.  These records reflect care and findings that post-date (in some cases by years) ALJ Cooperman's 2012 decision.  This new evidence was recounted in detail in ALJ Masengill's decision.  In such circumstances, cabining ALJ Masengill's discretion in the name of the law of the case and rule of mandate, would have, as it turns out, produced an inaccurate and unjust result.  Thus, in the view of the undersigned, the fairly voluminous new medical information is the basis of an exception to these doctrines.  See Stacy, 825 F.3d at 567 (the law of the case doctrine "should not be applied when the evidence on remand is substantially different"); Drummond, 126 F.3d at 842.  Therefore, I find that the law of case doctrine and the rule of mandate do not apply here because the receipt of new evidence, anticipated by the Remand Order, falls within a recognized exception to their application.

For this reason, Welch's reliance on Stacy is misplaced.  An ALJ found Stacy, a stationary engineer, not disabled at Step Five because of Stacy's ability to do other jobs available in the economy, and Stacy appealed.  Id. at 566.  The case went through two remands and an appeal to the district court leading to a second remand.  Id. at  566-67.  On the second remand, a different ALJ found that Stacey was able to perform past relevant work, and therefore denied

17

Stacy benefits at Step Four.  Id. at 567.  Specifically, when Stacy testified before that ALJ that most of his past work was in a supervisory, and not performing capacity, the VE opined that Stacy could perform his past work, and the ALJ agreed, denying benefits at Step Four (instead of Step 5).  Id.  On a third appeal, Stacy argued that the denial of his benefits at Step Four was a violation of the law of the case and the rule of mandate.  Id.  The district court affirmed the ALJ's Step Four finding and held that neither the law of the case doctrine nor the rule of mandate was violated.  Id.  Stacy then appealed to the Ninth Circuit, which held that the law of the case doctrine and the rule of mandate both applied in the social security benefits setting.  Id. The Ninth Circuit held that the Step Four findings from the first two ALJ determinations were "typically the type of determination[s] that should not be reconsidered under the law of the case doctrine."  Id.  However, the law of the case doctrine "should not be applied when the evidence on remand is substantially different, when the controlling law has changed, or when applying the doctrine would be unjust."  Id.  The Ninth Circuit found that the district court did not abuse it's discretion by affirming the denial of benefits based at Step Four because new evidence was presented.[5]  In language particularly relevant to the exception, the Ninth Circuit said:

> The ALJ properly considered this new, highly probative testimony about Stacy's ability to perform his past work and made a new finding supported by that testimony.  Given the new evidence on remand, the district court did not abuse it's discretion in declining to apply to law of the case doctrine.

Id. at 567.

Welch also relies on Staples v. Colvin, No. 2:15-CV-392-DBH, 2016 WL 4146083, at *2 (D. Me. Aug. 3, 2016), report and rec. adopted, No. 2:15-CV-392-DBH, 2016 WL 5854510 (D.

---

[5] The Ninth Circuit also affirmed the district court's ruling that the rule of mandate was not violated by the ALJ's forming of a new and contrary determination on Step Two, given caselaw recognizing that on remand, a lower court may "decide anything not foreclosed by the mandate."  Id. at 568 (citing Hall v. City of Los Angeles, 697 F.3d 1059, 1068 (9th Cir. 2012)).

Me. Oct. 6, 2016), but that decision is also distinguishable.  Staples was originally denied

benefits at Step Five.  No. 2:15-CV-392-DBH, 2016 WL 4146083, at *2 (D. Me. Aug. 3, 2016),

report and rec. adopted, No. 2:15-CV-392-DBH, 2016 WL 5854510 (D. Me. Oct. 6, 2016).

After the decision was remanded by the district court, a new ALJ made a finding at Step Two

that Staples did not have a severe impairment, resulting in a denial of benefits.  Id.  Staples

challenged the second ALJ's denial at Step Two, claiming he came to the opposite conclusion as

the first ALJ without explaining how the conclusion was reached.  Id.  The Court held that

"reconsideration of the finding at Step 2 that a claimant's impairment is severe is foreclosed

when the remand order does not specifically direct the administrative law judge to undertake that

task."  Id. (citing Maddocks v. Astrue, No. 1:11-cv-461-NT, 2012 WL 5255197, at *3 (D. Me.

Sept. 30, 2012) (concluding in the absence of "persuasive evidence that the administrative law

judge labored under a basic misconception of the evidence, it would be inappropriate to disturb

prior administrative findings that have never been challenged")).  The court did remand the case,

stating the "court's opinion vacating the decision of the first [ALJ] did not permit the second

[ALJ] to reject the Step 2 finding of severity by the first [ALJ]."  Id. at 3.

        Unlike both Stacy and Staples, the Remand Order expressly directed ALJ Masengill to

review de novo the sit/stand protocol that ALJ Cooperman found, but failed to quantify.  See

Dkt. no. 17-12, p. 17.  After extensive review of the record, including medical records generated

after the Remand Order, ALJ Masengill found that there was not sufficient evidence in the record

to support ALJ Cooperman's finding that Plaintiff required a sit/stand option, assigning values of

zero to the length and frequency of these activities.  Because ALJ Masengill was expressly

directed to address the specifics of ALJ Cooperman's sit/stand option, the latter's finding that

Welch needed a sit/stand option was not law of the case that could not be disturbed.  I find the caselaw cited by Welch to be distinguishable from this case on these grounds.

The undersigned finds that the Decision does not violate the law of the case doctrine or the rule of mandate, and in fact is with within the scope of the Remand Order.

### B.  Weight Afforded to Medical Opinions

Welch generally disputes the weight ALJ Masengill gave to the opinions of physicans who provided care to Welch or reviewed the medical file.

#### 1.  Treating Physician Dr. Ramey

One such care provider was Dr. Ramey, Welch's treating physician.  He diagnosed Welch with fibromalgia and arthritis.  Dkt. no 17-11, p. 19.  While ALJ Masengill accepted those diagnoses, he nevertheless gave Dr. Ramey's opinions little or no weight.  Id. at 32.  Welch argues that this was error.  The undersigned disagrees.

As an initial matter, Social Security regulations provide that where the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," the treating physician's opinion should be afforded controlling weight.  See 20 C.F.R. § 404.1527(c). If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ considers the following factors to determine the weight to which the opinion is entitled: "(1) length of treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) evidence in support of the medical opinion; (4) consistency of the opinion with the record as a whole; (5) specialization of the treating source; and (6) other factors that tend to support or contradict the opinion."  Id.  The ALJ is not required to discuss each

factor, and where the ALJ "minimally articulates" the reason for affording less than controlling weight to the treating physician, the Court must uphold the decision.  Green v. Astrue, 588 F. Supp. 2d 147, 155 (D. Mass 2008); see also Berger v. Astrue, 516 F.3d 539, 545 (7th Cir.2008). The First Circuit has held that an ALJ is not required to give greater weight to the opinions of treating physicians.  Arroyo v. Secretary of HHS, 932 F.2d 82, 89 (1st Cir. 1991) ("The ALJ was not required to accept the conclusions of claimant's treating physicians on the ultimate issue of disability.")  (citing Tremblay v. Secretary of Health and Human Servs., 676 F.2d 11, 13 (1st Cir. 1982)).

Welch argues that despite ALJ Masengill's acceptance of treating physician Dr. Ramey's diagnosis that Welch is severely impaired by fibromyalgia, his decision to give little or no weight to Dr. Ramey's opinions because of a lack of "objective findings" is error.  Dkt. no. 20.  Welch correctly notes that courts have determined that a lack of specific objective findings does not negate a diagnosis of fibromyalgia because fibromyalgia is characterized by a lack of objective findings.  See e.g.  Green-Younger v. Barnhart, 335 F.3d 99, 108-09 (2d Cir. 2003); Cline v. Sullivan, 939 F.2d 560, 566 (8th Cir. 1991).  Given these cases, Welch's argues that ALJ Masengill improperly discounted Dr. Ramey's opinion based on the ALJ's determination that there are no objective findings leading to his diagnosis.  Id.

While this argument is logical, it largely misapprehends ALJ's use of the phrase "objective findings."  A review of his decision shows that he employed "objective findings" to refer, not to the diagnosis of fibromalgia – he accepted that diagnosis – but to the significant informational deficits and inconsistencies in Dr. Ramey's records, which call into question their reliability and hence the reliability of Dr. Ramey's opinions.  Indeed, ALJ Masengill meticulously addressed the opinions Dr. Ramey formulated throughout his care of Welch, and

the basis for the weight ALJ Masengill assigned such opinions.  For instance, the ALJ gave

limited weight to Dr. Ramey's functional capacity assessment on October 19, 2011 which

limited Welch to sedentary exertion and an inability to perform postural activities.  See Dkt. 17-

11, p. 35.  The ALJ wrote:

> As was noted above, Dr. Ramey's treatment records do a poor job of documenting
> objective findings that support the claimant's complaints of limited functioning in her
> joints or objective indicators of arthritis.  There is no consistent observation to support
> weakness/pain in the hands/wrists/arms that support an inability to handle light exertion.
>
> Similarly, the findings of the lower extremities documented in Dr. Ramey's records do
> not support a limitation to two hours standing/walking or inability to climb, balance,
> kneel, crouch, crawl, or stoop.

Id.   On March 22, 2011, Dr. Ramey examined Welch.  She was depressed and had several

trigger points, and complaints of severe redness, swelling and pain of the hands, indicative of

arthritis.  Id. at 36-37.  Dr. Ramey found that Welch's arthritis and fibromyalgia aggravated her

knees, ankles and fatigue.  Id.  In giving this assessment little weight, the ALJ noted that Dr.

Ramey's report reflected no evidence of muscle weakness, neurological deficits, or problems

with her extremities.  No "new" inflammatory sites were observed, but there was also no note of

any present inflammatory sites.  Id.  The ALJ wrote:

> Dr. Ramey notes the claimant's condition will require her to have 10 breaks a day of 10
> minutes and that Welch would miss more than four days a month.  She again is restricted
> to sedentary exertion.  The lack of objective findings from the treatment record dated the
> same as this opinion provides inadequate support for such extreme findings.  Even
> looking at Dr. Ramey's other records (or those of other providers from around this time),
> the undersigned sees little objective support for such severe limitations.

Id.  As these excerpts illustrate, the lack of "objective findings" that informed ALJ Masengill's

assignment of weight to Dr. Ramey's opinions refers not to evidence of the diagnosis of

fibromyalgia, but to corroboration of or support for the limitations which Dr. Ramey opined were

the consequence of fibromyalgia and arthritis.  In other words, ALJ Masengill focuses on Dr.

Ramey's failure to develop a record of physical restrictions – a lack of "consistent observation" of actual functional limitations – resulting from Welch's fibromyalgia and arthritis.

However, while significant, the failure to develop a reliable record of the functional impact of fibromyalgia and arthritis on Welch is not the only deficit the ALJ noted in discounting the treating physician's opinions.  The ALJ noted that the primary form of treatment Dr. Ramey provided Welch was nearly weekly of injections of Methotrexate for well over a year.  Id. at 31. At the hearing, and to other care providers, Welch complained that Methotrexate caused nausea and vomiting that she could not tolerate.  However, "none of Dr. Ramey's treatment records in that time make any reference … to side effects of nausea/vomiting.  In fact, the records also note a denial of such … symptoms."  Id.

Similarly, the ALJ questioned the reliability of Dr. Ramey's diagnosis of arthritis, given its inconsistency with opinions of Dr. Ketsler (who on his first encounter opined that anxiety was Welch's dominant issue) and Dr. Jolda.  Id.

Finally, ALJ Masengill observed that "[t]he records of Dr. Ramey at times appear in isolation of other records."  Id.  As an example, he noted that Welch sought emergency care for a bruised tailbone and back pain following a fall.  Id.  Dr. Ramey saw Welch the next day.

> [T]here is no mention of the pain, or observations of stiffness in the back or other findings from the emergency department….There are several such examples in the chronology of the records, which the undersigned finds diminishes the reliability of Dr. Ramey's opinion as his records are remarkably benign for the severe restrictions he lists.

Id.  Elsewhere, ALJ Masengill noted: "[T]here were times where Dr. Ramey saw the claimant a day or two after an emergency department visit or encounter with Dr. Flaminiano where acute findings were observed regarding an issue with a joint.  However, Dr. Ramey's records note no acute findings or record the claimant reporting any issues."  Id. at 32.

As compared to the record, Welch's challenge here somewhat mischaracterizes the reasons that the ALJ gave for discounting Dr. Ramey's opinions.  Putting the above examples in the context of the larger medical record, ALJ Masengill accepted Dr. Ramey's diagnosis of fibromyalgia for the very reasons that Welch details in her motion for reversal: because no specific findings are required for a diagnosis of fibromyalgia, because it has been diagnosed and treated by Dr. Ramey for years, and because of the consistent findings of tender/trigger points. Dkt. no. 17-11, p. 34.  He gave limited weight to Dr. Ramey's diagnosis of arthritis.  Id. at 35. However, ALJ Masengill thoughtfully assessed Dr. Ramey's opinions.  They are imbedded with notes which, while spanning many years, are sparse and do not offer any significant detail for the basis of his assessments.  The treatment notes often do not align with the restrictions Dr. Ramey suggests.  Id.  The opinions of Dr. Flaminiano, Dr. Jolda, and Dr. Ketsler conflict with Dr. Ramey's diagnosis of arthritis, noting that Welch's lack of inflammation, swelling, effusion, and other signs are not consistent with a diagnosis of arthritis.  Dkt. no 17-11, p. 31.  Pursuant to examination, Dr. Jolda determined that Welch had dexterity in her hands and nothing notably wrong with her knees.  Id.  Dr. Jolda suggested that Welch's symptoms were more akin to a chronic pain syndrome.  Id.  Dr. Ketsler opined that Welch's anxiety issues were the more dominant ailment and speculated that Welch may suffer from some other connective tissue disease.  Id.  Given this record, the undersigned finds that the ALJ provided ample justification for giving Dr. Ramey's opinions little or no weight.

### 2.   Other Care Providers

Welch also disputes the weight afforded to two other physicians who provided opinions on Welch's specific functional limitations, Dr. Weeratne and Dr. Manning.

"[T]he resolution of conflicts in the evidence and the determination of the ultimate question of disability is for [the Commissioner], not for the doctors or for the courts." Monroe v. Barnhart, 471 F. Supp. 2d 203, 211 (D. Mass. 2007) (quoting Lizotte v. Sec'y of Health and Human Servs., 654 F.2d 127, 128 (1st Cir. 1981) (alterations in original)); see also 20 C.F.R. § 416.927(e)(1) ("we are responsible for making the determination or decision about whether you meet the statutory definition of disabled…. A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Thus, while opinions from treating and examining physicians are helpful, even controlling, the ALJ is required to make a decision that is supported by substantial evidence.   Monroe, 471 F. Supp. 2d at 211.  If the ALJ adopts the opinion of a non-examining source or rejects the opinion of a treating physician, then a court must uphold that determination so long as a "reasonable mind, reviewing the record as a whole, could accept it as adequate to support his conclusion." Lizotte, 654 F.2d at 128.  Applying these principles, I reject Welch's challenge to the weight assigned to the opinions of Dr. Weeratne and Dr. Manning.

Welch objects to the weight afforded Dr. Weeratne's opinion because Dr. Weeratne did not examine Welch and did not consider fibromyalgia as a diagnosis.  As the foregoing discussion shows, an ALJ is not restricted in the weight he or she may assign the opinion of a non-examining physician as long as the evidence is adequate to support that determination. Further, the record suggests that Dr. Weeratne did not overlook evidence of fibromyalgia.  Dr. Weeratne reviewed Welch's file in October 2010.  See dkt. no. 17-20, p. 64.  Dr. Ramey's diagnosis of fibromyalgia appears to have been made in 2011.  See dkt. no. 17-9, p. 46. However, Dr. Weeratne's notes reflect a review of Dr. Ramey's records, including notations of rheumatoid arthritis and Welch's complaints of arthritis and myalgias.  See dkt. no. 17-20, p. 55.

It is clear that ALJ Masengill carefully considered the extent to which Dr. Weeratne's opinion was consistent with the overall medical record.  The ALJ adopted undisputable portions of Dr. Weeratne's opinion – such as Welch's monocular vision.  However, the ALJ also rejected Dr. Weeratne's suggested postural limitations because there was a lack of objective findings of deficiency with any major joints on a consistent basis.  Id. at 87.  In the final analysis, the ALJ assigned "some" weight to Dr. Weeratne's opinion; Welch's claim that the ALJ should have assigned "little" weight may be largely semantics.  In the view of the undersigned, the ALJ's determination is adequately supported.

Welch claims that the "considerable" weight afforded to Dr. Manning's opinion is unsupported because Dr. Manning also did not examine Welch and did not consider the diagnosis of fibromyalgia.  This argument suffers from many of the same defects as Welch's attack on the weight ALJ Masengill assigned Dr. Weeratne's opinion.  As noted above, the ALJ is not bound to assign a certain amount of weight to an opinion simply because it comes from a non-examining physician.  Further, as noted by the Commissioner (and not disputed by Welch), Dr. Manning relied in part on Dr. Ketsler's examination findings.  See Dkt. 22 at 18.  The Commissioner accurately notes that it is not clear that Welch ever disclosed to Dr. Ketsler – and thus indirectly to Dr. Manning – Dr. Ramey's diagnosis of fibromyalgia.  Id. at 19.  Beyond that, a fair inference from the record is that ALJ Masengill carefully considered the opinion of Dr. Manning, the sources of his opinion, and the extent to which it was consistent with the overall medical record.  For instance, the ALJ found that the limitations detailed by Dr. Manning, which were based on Welch's medical records, were consistent with the medical records provided; however, ALJ Masengill did not adopt Dr. Manning's ultimate finding of disability.  See Dkt 17-11 at 36.  In my view, the record reflects a thoughtful and discriminating assessment of Dr.

Manning's opinion that is supported by substantial evidence.  Accordingly, I reject Welch's

challenge.

> 3.  Determination of Welch's RFC.

Welch contends that ALJ Masengill improperly determined Welch's RFC because weight

was improperly afforded to the above-mentioned medical opinions which factored into the RFC.

Thus, Welch argues that the vocational expert testimony provided was unreliable as it was based

upon an inaccurate RFC, and was improperly used to determine that Welch was disabled at Step

Five.  Because the undersigned finds that weight assessments were supported and appropriate, I

reject Welch's argument.

> C.  RFC and Ability to Perform the Identified Jobs

Finally, Welch argues that the Court should remand because one of the jobs ALJ

Masengill relied upon in determining Step Five appears to be in conflict with ALJ Masengill's

RFC finding.  ALJ Masengill adopted findings that Welch had limitations in depth perception

and field vision due to her monocular vision.  Dkt. no. 17-11, p. 35.  Therefore, ALJ Masengill

limited Welch to work that did not require binocular vision.  Id. at 30.  ALJ Masengill

determined that Welch was not disabled because, considering Welch's age, education, work

experience, and RFC, there were jobs that existed in significant numbers in the national economy

that Welch could perform.  Id. at 39.  The Decision lists three jobs that exist in significant

numbers that Welch could perform: packaging, mail sorter, and assembler.  Id.  Welch argues

that ALJ Masengill erred by relying on assembler as a potential job for Welch because the job of

assembler requires frequent depth perception.  The Commissioner concedes that assembler was

not an appropriate suggestion.  Nonetheless, because the vocational expert testified to the

availability of significant numbers of jobs in the two other suggested lines of work, namely packager and mail sorter, the Court finds that there is evidence in the record to support the Commissioner's determination that Welch is not disabled. Baker v. Astrue, 10-cv-454, 2011 WL 6937505 (D. N.H. Nov. 15, 2011) (holding that because one of the three jobs relied upon by the ALJ met the limitations set forth by the ALJ, "the ALJ did not err at step five by determining that there are jobs in the national economy that [the claimant] can perform").

IV.   Conclusion

I recommend DENYING Welch's Motion to Reverse the Decision of the Commissioner (Dkt. no. 20) and GRANTING the Commissioner's Motion to Affirm (Dkt. no. 21). [6]

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge

---

[6] The parties are notified that any party who objects to these proposed findings and recommendations must file a written objection thereto within fourteen days of service of this Report and Recommendation. The written objections must identify with specificity the portions of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72(b)(2). The United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See, e.g., United States v. Diaz-Rosado, 857 F.3d 89, 94 (1st Cir. 2017); United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Keating v. Sec'y of Health & Hum. Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).